UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| ROBERT SCOTT GOLDEN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:05-cv-786-RLY-TAB |
| | ) | |
| CHAUTAUQUA AIRLINES, INC., an | ) | |
| Indiana Corporation, and JEROME | ) | |
| BALSANO, an individual, | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Robert Scott Golden, is a former employee of Chautauqua Airlines, Inc.

In Count I of Plaintiff's Complaint, he alleges that Defendants interfered with his right to

take leave under the Family and Medical Leave Act, and in Count II, he alleges that

Defendants retaliated against him for the same.  Defendants now move for summary

judgment.  For the reasons explained below, the court **GRANTS** Defendants' motion.

**I.      Summary Judgment Standard**

Summary judgment is proper only if the record shows "that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the burden of informing the court of the basis for its motion and

demonstrating the "absence of evidence on an essential element of the non-moving

party's case," *Celotex Corp.*, 477 U.S. at 323, 325.  To withstand a motion for summary

judgment, the nonmoving party may not simply rest on the pleadings, but rather must "make a showing sufficient to establish the existence of [the] element[s] essential to that party's case, and on which that party will bear the burden of proof at trial. . ." *Id*. at 322. If the non-moving party fails to make this showing, then the moving party is entitled to judgment as a matter of law. *Id*. at 323.

In determining whether a genuine issue of material fact exists, the court must view the record and all reasonable inferences in the light most favorable to the non-moving party. *See Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc*., 98 F.3d 262, 264 (7th Cir. 1996). No genuine issue exists if the record viewed as a whole could not lead a rational trier of fact to find for the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Ritchie v. Glidden Co.*, 242 F.3d 713, 720 (7th Cir. 2001).

## II.    Facts

### A.    Overview of Chautauqua Airlines

1.    Chautauqua, a regional airline headquartered in Indianapolis, Indiana, operates through code-sharing agreements with American Connection, Delta Connection, United Express, and US Airways Express. Chautauqua employs pilots, flight attendants, maintenance, customer service, and support personnel in approximately 12 cities. (Affidavit of Jerome Balsano ("Balsano Aff.") ¶ 3). Bryan Bedford has been President and CEO of Chautauqua since 1999. (Deposition of Bryan Bedford ("Bedford Dep.") at 12). Hal Cooper has been the Chief Financial Officer of

2

Chautauqua since 1999.  (Deposition of Hal Cooper ("Cooper Dep.") at 7).

2.      Jerome Balsano is currently the Vice President of Customer Service.  (Deposition
of Jerome Balsano ("Balsano Dep.") at 20).  Balsano oversees the customer service
function of the airline, the operation of the stations, security, and acts as a liaison
between Chautauqua and the code share partners.  (*Id*. at 21).  Balsano directly
supervises the Director(s) of Stations, who supervise the regional Managers and
station Managers, who in turn supervise the front line employees.  (Balanso Aff. ¶
4).

3.      On March 4, 1996, Chautauqua hired Plaintiff as the Manager of Stations in
Indianapolis.  (Affidavit of Kathy Wooldridge ("Wooldridge Aff."), Ex. 1).  As
Manager of Stations, Plaintiff oversaw the ground handling and operation of all
Chautauqua stations, which required extensive travel.  (Balsano Dep. at 27-28).
Balsano had the ultimate authority to determine where Plaintiff needed to be on a
daily basis and considered the performance of particular stations, including
damage issues, on-time performance, failures in following protocol, FAA
violations and security issues. (*Id*. at 27-28, 30, 90).

4.      On July 12, 1998, Chautauqua promoted Plaintiff to Director of Stations.
(Wooldridge Aff., Ex. 5).  The specific duties and responsibilities of a Director of
Stations are stated in the job description and include: acting as a liaison between
the Customer Service Managers and the Vice President of Customer Service;
overseeing the operations of all stations, and accomplishing additional duties as

3

assigned by the Vice President of Customer Service.  (Deposition of Robert Scott Golden ("Plaintiff Dep."), Ex. 1).

5.      Prior to taking leave, Plaintiff traveled as a Director of Stations.  (*Id*. at 52).  On average, Plaintiff took four or more overnight trips per month depending on the workload and what was going on in the system.  (*Id*. at 53).  In certain cases, Plaintiff had two to three overnights per week.  (*Id*. at 113).  Plaintiff was responsible for customer service for the Delta Express, US Airways Express, and the United Express stations.  (*Id*. at 164-65).

6.      In mid-2004, United Express began operating in Chicago.  (Deposition of Joe Dale ("Dale Dep.") at 101-02).  The parties dispute whether Plaintiff was involved in getting the new United Express product launched in Chicago.  (*Compare* Affidavit of Robert Scott Golden ("Plaintiff Aff." ¶ 20 (stating he was not responsible for the Chicago station) *with* Dale Dep. at 103-04) (Plaintiff was responsible for the Chicago station)).

7.      Plaintiff was responsible for approximately 20 stations, and Balsano, as Plaintiff's direct supervisor, would tell Plaintiff which days he was supposed to be in a particular location.  (Balsano Dep. at 88-89).  Plaintiff would make suggestions, but Balsano made the ultimate decision regarding Plaintiff's travel schedule.  (*Id*. at 90; Plaintiff Aff. ¶ 31).

**B.      Overview of Dale's Job and the Order to Move to St. Louis**

8.      Chautauqua hired Joe Dale as the Customer Service Manager for the Fort Wayne

station on January 1, 1996.  (Wooldridge Aff., Ex. 3; Dale Dep. at 31).

9.      Dale's duties expanded in late 1999/early 2000 when Chautauqua entered a new

code share agreement to fly as TransWorld Express ("TWE").  (Dale Dep. at 36-

37).  Balsano asked Dale to act as the Customer Service Manager for the TWE

operation, including developing the training and starting up five to seven new

stations and the hub in St. Louis.  (*Id*. at 36-37).

10.     On May 1, 2000, Chautauqua promoted Dale to Director of Stations for the TWE

operation.  (Wooldridge Aff., Ex. 4).  Dale's promotion meant that as of 2000,

Balsano supervised two direct reports: Plaintiff, Director of Stations, located in

Indianapolis; and Dale, Director of Stations, located in Fort Wayne, Indiana.

(Balsano Aff. ¶ 5).  Dale was responsible for all of the TWE stations, and Plaintiff

was responsible for all of Chautauqua's other code share stations.  (*Id*.).

11.     As the St. Louis hub grew larger, it began experiencing ground handling problems

resulting in operational challenges and aircraft damage.  In approximately January

2000, a ground handling crew significantly damaged an airplane during de-icing.

(Dale Dep. at 71-72).  When this incident occurred, Balsano called Dale and

ordered Dale to meet him in St. Louis.  (*Id*. at 41).  Upon meeting in St. Louis,

Balsano ordered Dale to take charge of the St. Louis operation immediately.  (*Id*.

at 42).  The order entailed running the customer service functions for the entire

hub operation, including the ramp and gate personnel.  (*Id*. at 43).  Initially, Dale

stayed in St. Louis for two straight weeks without returning to his home.  (*Id*. at

5

69).  Dale understood that he would be in St. Louis until the issue was fixed.  (*Id*.

at 80).  After that, Dale remained in St. Louis for the next six months, and went

home on the weekends occasionally.  (*Id*. at 65, 69-71).  Dale did not receive a pay

increase when he went to St. Louis.  (*Id*. at 45).  Dale was not promised anything

to go to St. Louis.  (*Id*. at 150).

12.     On February 25, 2002, Chautauqua gave Dale a pay increase which was retroactive

to January 1, 2002.  (Wooldridge Aff., Ex. 5).  After it became clear that Dale

would remain in St. Louis, Chautauqua changed Dale's title from Director of

Stations to Director of Hub Operations.  (Dale Dep. at 45).  Dale became solely

responsible for St. Louis, and his other TWE stations were given to Plaintiff.  (*Id*.

at 56-57).  Other than that, Dale's duties did not change.  (*Id*. at 66).

13.     Dale eventually moved his family to St. Louis.  (*Id*. at 64).

14.     As Director of Stations, Balsano determined Dale's travel schedule.  (*Id*. at 54-55,

73).

### C.      Chautauqua's Compensation Policies

15.     In approximately 2000, a private equity firm took over Chautauqua and put new

compensation policies in place for Directors and officers.  The new policy was to

forego the adjustment of base pay on an annual basis, and instead to look at total

compensation including bonuses and stock option compensation.  (Bedford Dep. at

86).  Total compensation includes base compensation, bonus compensation, and

stock option compensation.  (*Id*. at 66).  Bedford held a meeting with officers and

Directors and explained that "a big chunk of compensation was going to be at risk but the view of our owners was to keep compensation flat and then reward performance with a bonus." (*Id*. at 65-66).

16. The new policy constituted a presumed freeze on base pay.  However, the new policy did allow for an adjustment on an "exceptional" basis.  (*Id*. at 87).  For example, base pay might change on a person finding a job someplace else and then renegotiating his or her salary to remain with Chautauqua.  (*Id*. at 70).  Another example is when a base pay adjustment is driven by salary compression.  Salary compression occurs when management level employees receive annual increases, and their pay encroaches on a Director's salary.  (*Id*. at 70-71).  If the base compensation increases, it will have an impact on the bonus allocation because it is a total compensation perspective.  (*Id*. at 72-73).  If an individual receives a pay increase in a given year, all other things being equal, it would reduce the amount of his/her bonus.  (Deposition of Robert Hal Cooper ("Cooper Dep.") at 42-43).

17. Each year bonuses are determined as follows: For the line employees, the President and CFO make a recommendation to the Board of Directors of a pool of dollars.  Once the Board approves the bonus pool, the pool is objectively calculated and allocated to the line employees based on longevity with Chautauqua.  (Bedford Dep. at 58, 61).  For managers and directors, the President and CFO recommend separate bonus pools to the Board for approval.  Next, the CFO and officers allocate the bonus pool among the departments.  (*Id*. at 59, 61,

63-64).  Then, the direct supervisor does a performance assessment and makes a recommendation for each individual bonus to the CFO.  The CFO refers the recommendations to the President for approval.  (*Id.* at 59).  The President possesses the discretion to approve the allocation of awards among the individuals involved.  (*Id.* at 59, 61).

18.   The primary factors for determining the amount of the bonus pool for Directors are overall corporate performance for the year, the number of participants in the pool, and their total compensation from the prior year.  (*Id.* at 59, 61).  The determination of the aggregate bonus pool is based on Company performance, not individual performance.  (*Id.* at 63).  Allocation of the bonus pool among specific Directors is based on an individual's total compensation, the amount of production during the year, and any extraordinary effort.  (*Id.* at 60).  "Performance is a key attribute of the bonus award for Directors."  (*Id.* at 60).

19.   In approving each Director's bonus, Bedford looks at the history of total compensation, compares that to other departments, and considers any outstanding performance.  (*Id.* at 76-77).  Similarly, Bedford has reduced individual bonuses at the Director level based on his knowledge of poor performance.  (*Id.* at 77-78; Cooper Dep. at 46).

20.   An individual's time away from work could be a factor in their bonus in that, if there is no production, there is no bonus.  (Bedford Dep. at 83-84).  Neither vacation, nor ordinary sick leave, would impact a bonus amount.  (*Id.* at 84).

However, a disability leave or military leave would impact a person's bonus.  (*Id*. at 84-85).  Any long-term leave would be prorated, including FMLA leave.  (*Id*. at 84-85).

### D.      Plaintiff's Raise and Subsequent Performance Issues

21.     By early 2004, some of the managers who worked under Plaintiff were getting close to his salary.  (Plaintiff Dep. at 62).  Plaintiff understood that a salary freeze was in effect.  (*Id*. at 61).  Plaintiff brought the salary compression to Balsano's attention, and Balsano made efforts to get a salary increase for Plaintiff.  (*Id*. at 61).  Bedford approved a $4,000 raise effective March 15, 2004, at which time Plaintiff's salary increased from $46,000 to $50,000 per year.  (*Id*., Ex. 2; Wooldridge Aff., Ex. 6).  Bedford reminded Balsano that Plaintiff's bonus would be reduced by the amount of the raise.  (Bedford Dep. at 94).

22.     In mid-2004, Plaintiff failed to provide Balsano with requested reports.  (Balsano Dep. at 46-47).  During the fourth quarter of 2003 or the first quarter of 2004, Balsano asked Plaintiff and Dale to submit reports twice a month describing their schedules and specific issues they were addressing at their stations.  (*Id*. at 48-54; Balsano Aff., Ex. 1).  Balsano instructed them that they were also responsible for having their subordinates complete such reports.  (Balsano Dep. at 48-54).  Plaintiff was responsible for three regional managers and one station manager.  (*Id*. at 48-49).  Plaintiff had to prepare his own report and submit copies of his subordinates' reports.  (*Id*. at 57).  Plaintiff agrees that Balsano's request for the

9

reports was reasonable and appropriate.  (Plaintiff Dep. at 66).  Plaintiff only provided the reports to Balsano sporadically.  (Balsano Dep. at 54).  Dale provided the reports to Balsano as requested.  (*Id*. at 55).  Balsano and Plaintiff had several conversations regarding the reports.  (*Id*. at 58).  Plaintiff felt it was too much to ask for reports twice a month, and therefore Balsano agreed to accept the report once a month.  (*Id*. at 58-59; Balsano Aff., Ex. 2).  After Balsano accepted Plaintiff's suggestion, Plaintiff provided the reports "sporadically."  (Balsano Dep. at 59, 66, and Ex. 1; Plaintiff Dep. at 68-69 (reports provided sporadically)).

23.   Moreover, Plaintiff was not involved in union negotiations; that responsibility was handled primarily by Balsano and Dale.  (Balsano Dep., Ex. 1; Plaintiff Dep. at 207-08 and Ex. 2).

24.   In 2004, Chautauqua acquired a new type of aircraft, the ERJ-170.  (Balsano Dep. at 69).  Chautauqua conducted the proving run for the ERJ-170 over a 10-day period in August or September 2004.  (Plaintiff Dep., Ex. 3; Dale Dep. at 97).  A proving run is the procedure used by an airline to prove to the FAA that it is competent to operate a new type of aircraft.  (Balsano Dep. at 69).  During each day of the proving run, Chautauqua operated a series of flights, usually originating in Indianapolis and flying to several different airports.  (Plaintiff Dep., Ex. 3).  The passengers on the flights were FAA officials and Chautauqua representatives.  (Balsano Aff. ¶ 6).  In addition to the written schedule, Balsano held meetings during which he assigned specific tasks to each participant.  (*Id*. ¶ 6).

25.   The parties dispute the specific duties assigned to Plaintiff.  Balsano testified that

Plaintiff's primary responsibility was to be on-site to observe the station and do

what was needed at a moment's notice.  On at least two occasions, Balsano

believed Plaintiff was not on-site for the proving run as scheduled.  (Balsano Dep.

at 70-71).  Plaintiff's other responsibility was to oversee the flights from

Indianapolis.  (*Id.* at 70).

26.   According to Plaintiff, his duties included: "(1) arranging for catering service on

the aircraft being tested; (2) working with Fred Bauman, the Customer Service

Manager at the Indianapolis station, coordinating aircraft arrival and departure gate

positions . . .; and (3) . . . observ[ing] United Airlines' employees who were

responsible for ground handling of the ERJ-170 during proving runs."  (Plaintiff

Aff. ¶ 14).  Plaintiff further claims that he was actually present for the proving

runs, but Balsano could not find him.  (Plaintiff Dep. at 69, 73).  Plaintiff vaguely

remembers a conversation with a co-worker to the effect that Balsano was looking

for him.  (*Id.* at 73).

27.   Balsano documented Plaintiff's performance in Plaintiff's 2004 performance

appraisal, which he completed on January 12, 2005.  He noted that "Plaintiff's

performance declined" and that, *inter alia*, Plaintiff failed to timely submit written

reports and failed to get involved in union negotiations.  (Balsano Dep., Ex. 1).

### E.   The Birth of Plaintiff's Child and Plaintiff's FMLA Leave

28.   Plaintiff's first child was born on September 14, 2004.  (Plaintiff Dep. at 24).  On

11

October 19, 2004, Plaintiff requested FMLA leave beginning on November 8, 2004, to care for his child after his wife returned to work.  (Wooldridge Aff., Ex. 7).

29.   Plaintiff first told Balsano about his intent to take FMLA on October 14, 2004, and Balsano had no problem with it.  (Plaintiff Dep. at 118).  However, Balsano subsequently made several comments that Plaintiff perceived to be discouraging comments about Plaintiff's FMLA leave.  (*Id*. at 101 and Ex. 4).  The conversations included the following: (1) On October 18, 2004, while Lenny Warmkessel (senior manager of training and security) was present, Balsano asked Plaintiff, "Are you still taking a leave?"  Plaintiff said, "Yes."  Balsano said, "You know I'm going to have to hire a replacement for you, don't you?"  Plaintiff said, "Yes, I understand, but I'm in a difficult position here and haven't had much choice but to take this leave."  Balsano said, "We all have to make difficult decisions."  (*Id*. at 118-19).  Balsano said, "You know you don't get travel benefits while you are on leave, don't you?"  (*Id*. at 104-05); (2) On October 19, 2004, Balsano said, "The leave couldn't come at a worse time, and there is never a good time for a director to take a leave."  (*Id*. at 103, 119); (3) During a conference call with managers, Plaintiff said, "I am taking a short leave," and Balsano said, "I don't consider this a short leave.  I consider 30 days a short leave."  (*Id*. at 105-06); (4) On November 4, 2004, Balsano said, "You are a director and you are asking for a leave.  What do you expect?"  (*Id*. at 106-07); (5) On November 5,

2004, Plaintiff told Balsano he was offended by the fact that Balsano thought he didn't work very hard on the ERJ-170 proving runs.  Balsano retracted that earlier statement and added that what he meant was that Plaintiff hadn't worked very hard the rest of the year.  Plaintiff asked for specifics, but did not think Balsano produced any with substance.  In this conversation, on a related matter of using sick time while on FMLA leave, Balsano stated again, "You're a director taking leave."  Plaintiff interpreted Balsano's comment "as if to say how inappropriate for you to even ask."  (*Id*. at 120-21).

30.   Balsano testified that he was disappointed Plaintiff was taking FMLA leave and expressed that to Plaintiff.  (Balsano Dep. at 130-31).  Balsano had general concerns about Plaintiff's absence and his ability to meet the customer service needs.  (*Id*. at 132-33).  However, Defendants granted the FMLA leave anyway. (*Id*. at 131-32).

31.   Plaintiff took 12 weeks of FMLA leave from November 8, 2004, to January 30, 2005.  (Wooldridge Aff., Exs. 6, 8; Plaintiff Dep. at 11).  Plaintiff used approximately five weeks of vacation concurrently with his FMLA leave, and was paid for the same.  (Supplemental Affidavit of Kathy Wooldridge ¶ 3).

**F.   Plaintiff's 2004 Bonus**

32.   In 2002, Plaintiff received a bonus of $14,200.  (Balsano Dep., Ex. 2).  In 2003, Plaintiff received a bonus of $20,000.  (*Id*.).  On November 24, 2004, Bedford sent a "Company Update" newsletter to all Chautauqua employees which stated the

Board had approved payment of the 2004 discretionary bonus award, and the payment amounts would be higher than last year's levels, which reflected the improvement the Company had experienced.  (Plaintiff Dep., Ex. 6).

33.   On December 7, 2004, Cooper asked Balsano for a recommendation on Plaintiff's 2004 bonus.  Cooper instructed Balsano to consider Plaintiff's actual performance, his contributions, and whether he made any material contribution to the ERJ-170 program, etc.  Cooper reminded Balsano that "as with previous bonus payments, the most significant factor is the individual's actual performance."  (*Id*. at Ex. 2). Cooper also instructed Balsano to prorate the amount to exclude any time Plaintiff was on leave.  (*Id*).  By "prorate the amount," Cooper meant that it is Company policy to consider production when calculating bonuses, and it is hard to be productive when you are not at work.  (Cooper Dep. at 38).

34.   Balsano reviewed Plaintiff's performance and concluded that he performed below average in 2004.  Balsano calculated Plaintiff's 2004 bonus as follows: The previous year's bonus was $20,000.  Due to below average performance, Balsano rated Plaintiff's bonus as compared to the previous year at $16,000.  Plaintiff took a leave of absence in November and therefore worked 10/12ths of a year. ($16,000 x 83% = $13,280).  Plaintiff received a $4,000 raise at his request (while other director's salaries were frozen).  ($13,280 - $4,000 = $9,280).  Then, Balsano rounded his bonus up to $10,000.  (Plaintiff Dep., Ex. 2).

35.   On December 17, 2004, Plaintiff called Balsano to discuss his bonus and secretly

taped the conversation.  (*Id*. at 189-91 and Ex. 7).  Balsano stated that Plaintiff's

bonus was based on three things: (1) performance; (2) having received a raise

when other directors didn't; and (3) working 10/12ths of the year.  (*Id*. at Ex. 7).

Plaintiff asked about a recent "Company Update" that suggested that bonuses

would be higher.  Balsano informed Plaintiff that the Update referred to the bonus

for the rank and file employees.  (*Id*.).

36.    On December 20, 2004, Plaintiff sent Balsano a letter complaining about his

bonus, and responding to the reasons advanced by Balsano in the December 17

telephone conversation for calculating his bonus at half of the amount of the

previous year.  (*Id*., Ex. 8).  Plaintiff stated that (1) he was never told that his raise

would adversely affect his bonus; (2) Balsano first brought up the issue of his job

performance only after he requested FMLA leave; and (3) his FMLA rights were

violated because he was only given credit for working 10 out of 12 months.  (*Id*.).

37.    On January 4, 2005, Balsano sent a response to Plaintiff's letter.  (Balsano Aff.,

Ex. 1).  Balsano explained that his FMLA leave played no role in his bonus

calculation.  He reminded Plaintiff that (1)  "bonuses are not an entitlement" but

are "discretionary"; (2) he previously explained to Plaintiff that a salary increase

would very likely affect his bonus; and (3) he spoke to Plaintiff several times about

his job performance, specifically about his failure to produce monthly updates, his

performance regarding the proving runs, etc.  (Balsano Aff., Ex. 1).

38.    In the past, other directors' and managers' bonuses (namely, Warmkessel's) have

15

been decreased based on lower performance and production. (Balsano Dep. at 163-65).

### G.   Plaintiff's Return to Work, Temporary Assignment in Chicago, Insubordination, and Termination

39.   During Plaintiff's absence, Chautauqua added extensive service at the Chicago O'Hare station.  (*Id*. at 98).

40.   During the month of January, the Company experienced serious ground handling problems including severe damage to airplanes.  (*Id*. at 102; Balsano Aff., Ex. 4). They were experiencing severe operational performance issues for on-time reliability and baggage issues.  (*Id*. at 121).  Both United Airlines and the FAA had contacted Chautauqua about the need to fix the problems.  (Bedford Dep. at 36). Balsano needed someone at the director level on the scene in Chicago.  (*Id.*).

41.   Plaintiff returned to work on Monday, January 31, 2005.  (Wooldridge Aff., Ex. 6). That day, Kathy Wooldridge, Director of Human Resources, and Balsano met with Plaintiff.  Balsano explained that he needed Plaintiff for a temporary assignment in Chicago.  Balsano explained to Plaintiff that Chautauqua was close to losing the code share with United Express.  (Plaintiff Dep., Ex. 9).  Balsano directed Plaintiff to travel to Chicago and remain on location to observe the banks of flights Monday through Friday until the crisis was resolved.  (Balsano Dep. at 121; Wooldridge Aff., Ex. 10).  Balsano informed Plaintiff that Chicago was his number one priority.  (Wooldridge Aff., Ex. 10; Plaintiff Dep. at 108).  Plaintiff complained

16

that Balsano was "springing Chicago on [him]," and said he would have to check his personal calendar and get back to him.  (Wooldridge Aff., Ex. 10).

42.    Later that day, the FAA called Balsano and threatened to pull Chautauqua's certification to operate the ERJ-170 at the O'Hare station.  (Plaintiff Dep. at 99). A shut down of the O'Hare station because of poor performance would likely have meant that the Company would be in breach of its obligations to United Airlines, which could in turn cause United to cancel its contract with the Company. (Balsano Aff. ¶ 8).

43.    Upon return from FMLA leave, Plaintiff received the same pay and benefits. (Plaintiff Dep. at 176).  However, Plaintiff complains that he did not have time to accomplish his duties and responsibilities for the Delta Express and US Airways Express operations.  He also states that his duties and responsibilities changed as follows: (1) he was no longer responsible for the Indianapolis station; i.e., the Station Manager no longer reported to Plaintiff; and (2) he was ordered to spend five days and four nights each week in Chicago on a temporary, but indefinite, basis.  (*Id*. at 176-78).

44.    Responsibility for the Indianapolis station was given to Dale because union negotiations were starting again, and Dale was actively involved in the negotiations.  (Dale Dep. at 114, 158-59).  Plaintiff admitted that he elected not to get involved in union negotiations.  (Plaintiff Aff. ¶ 25).

45.    The removal of the Indianapolis station allowed Plaintiff more time to focus on

Chicago, and would not impair his compensation or bonus in the future.  (Plaintiff

Dep. at 179-80).

46.    On February 1 and 2, 2005, Plaintiff flew back and forth to/from Chicago.  (*Id*. at

Ex. 12).

47.    On February 2, 2005, Plaintiff learned that his father had been taken to the hospital

in Nashville, and Plaintiff left Chicago immediately.  After only two partial days in

Chicago, Plaintiff stated that the contractor "is moving in the right direction to

extinguish some of the existing fires we've had there."  (Balsano Aff., Ex. 5).

48.    On February 3 and 4, 2005, Plaintiff took vacation days due to his father's

hospitalization.  (Plaintiff Dep., Ex. 12).

49.    On Monday, February 7, 2005, Plaintiff failed to go to Chicago and failed to tell

Balsano.  Later that day Balsano and Wooldridge met with Plaintiff.  (Balsano

Aff., Ex. 6).  Plaintiff said he did not go to Chicago due to "personal reasons

related to his father's illness."  (*Id*.).

50.    After the meeting, Balsano e-mailed Plaintiff and reminded him that he was

expected to leave for Chicago Monday around noon and return Friday around

noon, so that he could monitor all banks of flights and attend the safety meeting on

Wednesday morning.  (*Id*.).

51.    On Wednesday, February 9, 2005, Plaintiff e-mailed Balsano and stated,

This new schedule of five days and four nights a week in Chicago is a great
hardship on my family.  I am happy and eager to work the schedule I have
always worked in the past (i.e. a couple of day trips to the station – in this

18

case ORD – a night or so a week), which is similar to how we've handled other problem contract hubs in the past. I know Joe [Dale] worked weeks in St. Louis, however, that was an entirely different situation, with his employees, etc. . .

(Plaintiff Dep., Ex. 13).

52. That day, Balsano responded to Plaintiff's e-mail and reminded Plaintiff that "[his] work schedule always required travel, some day trips and some week long trips." (*Id*., Ex. 14). Balsano stated that the situation in Chicago was worse than the situation in St. Louis because the Chicago employees were not Chautauqua employees, and therefore it was at least as important for Plaintiff to be physically present. (*Id*.). Balsano informed him that he had deliberately ignored his past instructions to be in Chicago Monday through Friday, and warned him that insubordinate behavior would likely lead to termination. (*Id*.).

53. On Thursday, February 10, 2005, Plaintiff responded to Balsano's e-mail and denied being insubordinate. (*Id*. at 15).

54. On Friday, February 11, 2005, Balsano responded and stated in part:

Regarding your assignment to Chicago, rest assured that had you not been on leave, you would have been assigned there earlier. Our business needs do not always allow advance notice. Surely, all of our senior managers and executives have been required to put personal issues aside because the Company requires immediate attention to given issues . . .

This is not an industry and you are not in a job where you are in total control of your work schedule . . . [T]his is a "Joe Dale STL" level emergency. Your on the scene presence is mandated. It is that simple. . .

As you well know, very little customer service is performed in Indianapolis. Thus, your job, by definition requires meaningful travel. In fact, you have

always had a significant travel component to your job.

(*Id.* at Ex. 16).

55.     During the following work week, February 14-18: Plaintiff spent Monday at the Indianapolis office; spent Tuesday and Wednesday at meetings in Atlanta; and spent Thursday and Friday in Chicago.  (*Id.* at Ex. 12).

56.     During the following work week, February 21-25: Plaintiff took a sick day on Monday; spent Tuesday in Indianapolis; spent Wednesday and Thursday in Chicago; and spent Friday at the Indianapolis office.  (*Id.* at Ex. 12).  When Balsano asked Plaintiff why he was not in Chicago that Friday, Plaintiff responded that he would go to Chicago as he saw fit in his professional opinion. (*Id.* at Ex. 20).

57.     Balsano and Cooper spoke with Plaintiff.  Cooper told Plaintiff that if he refused to follow reasonable work related instructions from his direct supervisor he would be fired.  (*Id.* at Ex. 20).  Plaintiff stated that Defendants paid him for his professional opinion and that he did not understand why his job had changed since he returned from leave.  Cooper explained that everyone's job had changed and that everyone was traveling more, including his superiors: Balsano, Bedford and Cooper.  The level of business in Chicago had substantially increased while Plaintiff was on leave and was experiencing severe problems that required on-site management.  (*Id.*).

58.     Plaintiff accepted that the business is always changing, but did not accept the fact

20

that his job needed to change.  (*Id*.).

59.    At that point, Cooper informed Plaintiff he was suspended and should go home.
(Plaintiff Dep., Ex. 20).

60.    Later that day, Plaintiff learned that his father was having open heart surgery on
Monday, February 28, 2005.  Plaintiff informed Balsano that he would be in
Nashville for his father's surgery.  (Balsano Aff., Ex. 9).

61.    On Monday, March 7, 2005, Balsano and Wooldridge met with Plaintiff.  (Plaintiff
Dep., Ex. 21; *Id*. at 90-91, 95-98).  When asked if he would perform his duties as
the Company directed, Plaintiff replied, "I will do my job with my professional
judgment as I always have and I am paid to give my professional opinion."
Plaintiff stated that he would perform his job "as I deem necessary."  (*Id*. at Ex.
21; *Id*. at 91).

62.    On March 9, 2005, Chautauqua terminated Plaintiff's employment for
insubordination.  (*Id*. at Ex. 23).

63.    After Plaintiff's termination, Balsano initially took over Plaintiff's duties in
Chicago, and then sent Dale and several other managers to provide on-site
coverage.

64.    In June 2005, Balsano hired a regional manager based in Chicago. (Balsano Dep.
at 104).

## III.    Discussion

The Family Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq*. ("FMLA" or

"the Act"), establishes two categories of protection for employees.  First, it provides for "prescriptive protections that are expressed as substantive statutory rights."  *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999).  The Act provides that an eligible employee may take up to twelve weeks of unpaid leave in any twelve-month period to care for, *inter alia*, a newborn baby.  29 U.S.C. § 2612(a)(1).  After the period of qualified leave expires, the employee is entitled to reinstatement in his former position or an equivalent one with "equivalent employment benefits, pay and other terms and conditions of employment."  29 U.S.C. § 2614(a)(1).   Moreover, the taking of FMLA leave "shall not result in the loss of any employment benefit accrued prior to the date on which leave commenced."  29 U.S.C. § 2614(a)(2).  To protect these rights, the FMLA declares it "unlawful for an employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any rights provided" by the FMLA.  29 U.S.C. § 2615.  An employee alleging a deprivation of substantive rights must demonstrate by a preponderance of the evidence only an entitlement to the disputed leave.  In such cases, the intent of the employer is irrelevant.  *Id.*

The Act also contains an anti-discrimination component that prohibits an employer from discriminating or retaliating against an employee who requests or takes leave pursuant to statute.  *Id.*  Moreover, "the employer may not consider the taking of FMLA leave as a negative factor in employment actions."  *Id.*  In these types of claims, the intent of the employer is relevant and the burden-shifting analysis of *McDonnell Douglas* applies with full force.  *King*, 166 F.3d at 891.

22

A.      **Plaintiff's Substantive FMLA Claim**

Plaintiff asserts three substantive violations against Defendants: (1) Defendants'

reduction of Plaintiff's 2004 bonus; (2) Defendants' failure to reinstate Plaintiff to his

pre-FMLA position or equivalent position; and (3) Defendants' discouragement of

Plaintiff's attempt to exercise his FMLA leave.

1.      **Reduction in Plaintiff's 2004 Bonus**

The corresponding regulations written by the Department of Labor opine that if an

employee's bonus is one of "production" versus "attendance," an employer may pro-rate

the bonus for the time the employee is on FMLA leave.  It reads, in pertinent part, as

follows:

> Bonuses for perfect attendance and safety do not require performance by
> the employee but rather contemplate the absence of occurrences. . .  A
> monthly production bonus, on the other hand does require performance by
> the employee.  If the employee is on FMLA leave during any part of the
> period for which the bonus is computed, the employee is entitled to the
> same consideration for the bonus as other employees on paid or unpaid
> leave (as appropriate).  *See* paragraph (d)(2) of this section.

29 C.F.R. § 825.215(c)(2).  *See also* DOL Op. Ltr., FMLA-110, 2000 WL 33157364

(Sept. 11, 2000) ("[S]ince bonuses may be pro-rated based upon hours worked, it would

not be a violation under FMLA to determine the bonus percentage based only upon the

actual hours of work during the monthly rating period.").

The two cases cited by the parties – (1) *Dierlam v. Wesley Jessen Corp.*, 222 F.

Supp. 2d 1052 (N.D. Ill. 2002) and (2) *Sommer v. The Vanguard Group*, 461 F.3d 397

(3rd Cir. 2006) – interpret the regulation above, and hold that a bonus program that is based on production goals, quality standards, company performance, and/or an employee's hours/weeks worked constitutes a production bonus in the DOL regulations, and may be prorated for absences under the FMLA. *Dierlam*, 222 F. Supp. 2d at 1057; *Sommer*, 461 F.3d at 401. A bonus program that is based on the absence of an occurrence, such as a perfect attendance bonus, may not be prorated. *Id.*

In this case, the court finds the bonus program instituted by Chautauqua for its officers and directors rewards not merely company performance, but also individual performance and production. Similarly, Chautauqua's bonus program for its officers and directors is more akin to a bonus program that requires some positive effort, not merely the absence of an occurrence.

Plaintiff argues that Chautauqua's proration policy interferes with his FMLA rights because Chautauqua prorates the bonuses of those who take unpaid forms of leave such as FMLA but does not similarly prorate the bonuses of those who take paid forms of leave, such as vacation or sick leave. The plaintiff in *Sommer, supra.*, raised a similar argument. The Court in *Sommer* found that this disparate treatment does not violate § 825.215(c)(2) because plaintiff's employer, Vanguard, also prorates a variety of non-FMLA leaves including long-term disability, workers compensation, personal leave, and unpaid court leave. *Sommer*, 461 F.3d at 405. Likewise, it is undisputed that Chautauqua prorates the bonuses of those who take other forms of leave, such as disability or military leave. (Finding of Fact # 20). Thus, "[b]ecause FMLA leave is but one of many forms of

24

leave which triggers proration . . . Vanguard complied with the mandate of § 825.215(c)(2) that those employees who take FMLA leave be afforded 'the same consideration for the bonus as other employees on paid or unpaid leave (as appropriate).'" *Id*.  The fact that Plaintiff used some accrued vacation concurrently with FMLA leave is irrelevant to the bonus determination.  As noted by the *Sommer* Court, "§ 825.215(c)(2) is concerned solely with the question of qualification and consideration for bonuses, not their calculation or proration." *Id*.  Finally, as a practical matter, were FMLA leave on par with vacation or sick leave, which are typically treated differently than other forms of leave, "[e]mployers would then be faced with the choice of providing full production bonuses to those employees who potentially miss up to 12 weeks of work in a 12-month period, or prorating the production bonuses of all employees who take accumulated vacation or sick leave." *Id*. at 405-06.  Surely, Congress did not intend such a result.  *See* 29 U.S.C. § 2614(a)(3) (stating that no employment right or benefit shall accrue to any employee while on FMLA leave, and FMLA leave takers are entitled to no rights or benefits other than those which the employee would have been entitled had the employee not taken FMLA leave).  The court therefore finds that Plaintiff would have been entitled to a higher bonus if he had not taken FMLA leave.

### 2.    Failure to Reinstate Plaintiff

As stated above, the FMLA provides that an employee who exercises his rights under the FMLA is entitled, upon the expiration of such leave, to the same position of employment or an equivalent position of employment.  29 U.S.C. § 2614(a)(1).  An

equivalent position is one that is virtually identical to the former position in terms of pay, benefits, and working conditions.  29 C.F.R. § 825.215(a); *Mitchell v. Dutchmen Manufacturing, Inc.*, 389 F.3d 746, 748 (7th Cir. 2004).  It must involve the same or substantially equivalent skill, effort, responsibility, and authority.  *Id.*

An employee, however, is only entitled to benefits that he would have retained if he had not taken a leave.  *Id.*; 29 C.F.R. § 825.312(d).  In other words, the FMLA "does not confer benefits to which an employee would not be entitled had the employee not taken leave."  *Ogborn v. United Food & Commercial Workers Union, Local No. 881*, 305 F.3d 763, 768 (7th Cir. 2002); 29 U.S.C. § 2614(a)(3)(B).  The employee bears the burden of demonstrating his right to be restored to the same or equivalent position. *Mitchell*, 389 F.3d at 748.

Plaintiff contends that his "reassignment to Chicago was a substantial change in the terms and conditions of his pre-FMLA leave."  (Plaintiff's Response at 19). Specifically, his objection was not to the Chicago assignment *per se*; rather, he objected to the requirement that he remain in Chicago Monday through Friday for an indefinite period of time.

The undisputed facts show that: (1) a significant part of Plaintiff's job always included overnight travel; (2) the needs of particular stations drive overnight assignments; (3) Plaintiff was responsible for twenty stations before his leave; (4) Chicago experienced severe ground handling problems, including severe damage to airplanes that threatened its business with United Airlines; and (5) his presence was required to ensure that

Chautauqua's business interests were not compromised.  The Chicago assignment was within his job responsibilities.  In short, Plaintiff fails to establish that he would not have been assigned to Chicago absent his leave.

Plaintiff also complains that his supervisory duties for the Indianapolis station were transferred to Dale.  Plaintiff testified that he did not remember the reasons advanced by Balsano and Wooldridge for taking his supervisory responsibilities away, but said, "It was not – it was not the answer I was looking for."  (Plaintiff Dep. at 179).  Plaintiff therefore does not contradict Defendants' assertion that they gave Plaintiff's Indianapolis station duties to Dale because he was involved in union negotiations there.  Moreover, Plaintiff admits that the removal of the Indianapolis station allowed him more time to focus on Chicago, and did not impair his compensation or bonus.  Thus, Plaintiff fails to establish that his supervisory duties were taken away because he took FMLA leave.

### 3. Defendant's Discouragement of Plaintiff's Attempt to Take FMLA Leave

Title 29 Section 825.220(b) prohibits an employer from "discouraging an employee from using [his] [FMLA] leave."  The comments by Balsano (*see* Finding of Fact # 29) reflect that Balsano was not happy that Plaintiff would be away from work for twelve weeks.  However, there is no evidence that his comments caused injury to Plaintiff, as Plaintiff received all the leave he requested.  *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1275 (11th Cir. 1999); *see also Ragsdale v. Wolverine World Wide,*

*Inc.*, 535 U.S. 81, 99 (2002); *Bila v. RadioShack Co.*, 2004 WL 2713270, *9 (E.D. Mich. 2004).  Absent such evidence, Plaintiff's claim must fail as a matter of law.

For the reasons explained above, the court finds Defendants did not interfere with Plaintiff's substantive FMLA rights.  The court therefore **GRANTS** Defendants' Motion for Summary Judgment on Count I of Plaintiff's Complaint.

### B.    Plaintiff's Retaliation Claim

A claim of retaliation under the FMLA is evaluated in the same manner as a claim of retaliation under Title VII.  *Buie v. Quad/Graphics, Inc.*, 136 F.3d 496, 503 (7th Cir. 2004).  In 2002, the Seventh Circuit explained that a plaintiff in a retaliation case has two distinct routes to establish his claim for retaliation in the summary judgment context: the "direct method" and the "indirect method." *Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002).  The direct method requires the plaintiff to present "direct" evidence that: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action of which he complains.  *Treadwell v. Office of Ill. Sec'y of State*, 455 F.3d 778, 781 (7th Cir. 2006).  To establish a direct case, the plaintiff can use either direct evidence that the employer's actions were based on the prohibited animus or circumstantial evidence from which a jury may infer intentional discrimination.  *Buie*, 366 F.3d at 503.

The "indirect method" requires the plaintiff to show: (1) he engaged in statutorily protected activity; (2) he was performing his job according to his employer's legitimate

28

expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.  *Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 793 (7th Cir. 2005).  If the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to come forward with a legitimate, non-discriminatory reason for its adverse action.  *Sitar v. Ind. Dept. of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003).

The parties argue their respective positions under both methods of proof.  The court begins its analysis with Plaintiff's direct case.

### A.   Direct Method

#### 1.   Adverse Employment Action

Plaintiff argues he is the victim of four adverse employment actions – a reduced bonus in 2004, the Chicago assignment, suspension without pay, and termination of employment.  Defendants argue that Plaintiff's 2004 bonus and the Chicago assignment were not adverse employment actions.

"The standard for whether an adverse employment action is 'material,' and therefore actionable is somewhat broader for retaliation claims than for disparate treatment claims."  *Fulmore v. Home Depot, U.S.A., Inc.*, 423 F. Supp. 2d 861, 879 (S.D. Ind. 2006) (citing 42 U.S.C. § 2000e-2(a), 2000e-3(a)).  Thus, an employer's action will be actionable in the retaliation context if it would have "'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S.Ct. 2405, 2415 (2006) (citing *Rochon v. Gonzales*, 438

F.3d 1211 (D.C. Cir. 2006) (quoting *Washington v. Ill. Dept. of Revenue*, 420 F.3d 658 (7th Cir. 2005)).

A reasonable worker could believe a $10,000 reduction in an annual bonus to be materially adverse to the extent it might dissuade him from filing a charge of discrimination.  It is undisputed that Plaintiff's bonus was tied to his overall annual compensation.  A reduction in overall compensation can amount to a materially adverse employment action.  *See Filmore*, 423 F. Supp. 2d at 879.  Accordingly, Plaintiff has raised a genuine issue of material fact as to whether he suffered a materially adverse employment action because of the reduction in his bonus.

The court fails to find, however, that Plaintiff's job assignment in Chicago for five days and four nights per week amounted to a materially adverse employment action.  The evidence reflects that at the time of Plaintiff's temporary assignment to Chicago, Chautauqua was in a crisis situation.  Although the timing of the assignment was not optimal from Plaintiff's standpoint, the fact remains that as Director of Stations, such job assignments were part of his job duties.  Complying with one's job duties is not an adverse action.

### 2.     Causal Connection

#### a.     2004 Bonus

The critical inquiry of the third element of the prima facie case is "whether the plaintiff has demonstrated that the [employer's] action occurred under circumstances which give rise to an inference of unlawful discrimination."  *Garrett v. Hewlett-Packard*

*Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002) (quotation omitted).

It appears, based upon a reading of Plaintiff's Response, that his argument in support of the third element of his prima facie case consists of the following: "Defendants failed to provide [Plaintiff] with the same vacation benefit he would have been provided had he not taken FMLA leave, and that Defendants reduced [Plaintiff's] 2004 annual [*sic*] because he was on FMLA leave. This is direct evidence of unlawful retaliatory conduct." (Plaintiff's Response at 24) (emphasis in original omitted).  Plaintiff fails to cite to any evidence in the record to support these statements.

Based upon a review of the evidence, it appears that Plaintiff is referring to Balsano's conversation with Plaintiff in which Balsano informed Plaintiff that the Company only considered him to be productive ten out of the twelve months of 2004, and the fact that the Company did not count his accrued vacation, which he used concurrently with his FMLA leave, towards his 2004 bonus. (Finding of Fact # 31).

Because, as discussed above, the bonus at issue was based upon productivity, Chautauqua lawfully prorated Plaintiff's 2004 bonus to take into account the fact that he was not at work for that time period.  That he used some of his accrued vacation concurrently with his FMLA leave does not negate the fact that he was on FMLA leave. The only difference is that he was paid for his accrued vacation.  *See* 29 U.S.C. § 2612(d)(2).

Moreover, the undisputed evidence reflects that Plaintiff received a lower bonus in 2004 than in 2003 because: (1) his performance declined; (2) he received a $4,000 raise;

31

and (3) he took a two-month absence and thus failed to perform during that time period.

(*See* Findings of Fact ## 33-35, 37).  For these reasons, Plaintiff's retaliation claim based

on his 2004 bonus fails as a matter of law.

### b.      Temporary Assignment in Chicago

Plaintiff contends that Balsano's negative comments about his FMLA leave, made

in close proximity to the assignment to Chicago, create a triable issue of fact regarding his

true motive.

In support of Plaintiff's argument, he cites *Snelling v. Clarian Health Partners,*

*Inc.*, 184 F. Supp. 2d 838, 851 (S.D. Ind. 2002).   In *Snelling*, the decision-maker in the

plaintiff's termination stated, "Maybe we will get lucky and be able to get rid of him

while he's gone."  *Id.*  The Court noted: "When statements similar to these are made

contemporaneously to a firing and uttered by a decision-maker, courts have found that

such evidence establishes discriminatory intent."  *Id.*

Balsano's comments – i.e., "You know I'm going to have to hire a replacement for

you,"  "I don't consider this a short leave," "You are a director and you are asking for

leave.  What do you expect?", etc. –  do not rise to the level of the comments in *Snelling*.

(*See* Finding of Fact # 29).  Moreover, the comments were made between October 18,

2004 and November 5, 2004, and thus were not made contemporaneously to the Chicago

assignment (January 31, 2005).  This case would be different if there was no crisis in

Chicago and Balsano sent Plaintiff to Chicago five days per week upon his return.

However, the intervening crisis that developed in January 2005 and climaxed on January

32

31, 2005, with the FAA call, breaks the causal connection.  Plaintiff has not produced any evidence to cast doubt on the legitimacy or seriousness of the crisis in Chicago.  Thus, Plaintiff's FMLA claim based on his temporary assignment to Chicago fails as a matter of law.

### c.     Plaintiff's Suspension and Termination

Plaintiff contends that "Defendants knowingly created a work requirement that they knew Plaintiff would have great difficulty fulfilling.  They then constructed a scenario in which Plaintiff's objection to staying in Chicago Monday through Friday for an indefinite period constituted 'insubordination.'" (Plaintiff's Response at 28). Plaintiff's conspiracy theory is belied by the evidence.  Balsano informed Plaintiff of the importance of his presence in Chicago to observe the banks of flights Monday through Friday.  Plaintiff refused his direct orders time after time.  Plaintiff invited his suspension and ultimate termination by his blatant refusal to accept his work-related assignment. The court therefore finds that Plaintiff has failed to establish a causal connection between his FMLA leave and his suspension and ultimate termination.

### B.     Indirect Method

Defendants contend that Plaintiff is unable to establish his prima facie case under the indirect method of retaliation because: (1) he did not perform to the Company's legitimate performance expectations and (2) he fails to identify a similarly situated employee who did not take FMLA leave and was treated more favorably.  With regard to his 2004 bonus and assignment in Chicago, Defendants also contend that Plaintiff is

33

unable to establish that he suffered an adverse employment action.

The analysis of whether Plaintiff was performing his job to the Company's legitimate expectations merges into the pretext inquiry. Moreover, and for the reasons previously articulated, the court finds that Plaintiff has raised a material issue of fact as to whether the reduction in Plaintiff's 2004 bonus constitutes an adverse employment action, but that Plaintiff's job assignment to Chicago does not constitute an adverse employment action. The court now addresses the fourth element of Plaintiff's prima facie case – the similarly situated prong.

Plaintiff contends that he was treated differently because "Defendants never required any other employee to stay in Chicago from Monday through Friday." (Plaintiff's Response at 30). The only evidence he provides for this statement is paragraph 27 of his affidavit. Plaintiff's assertion is insufficient to raise a genuine issue of material fact, as he fails to name any other Director of Stations who refused a direct order for temporary duty in another city.

Even if Plaintiff was able to establish a prima facie case of FMLA retaliation, Defendants submitted unrebutted evidence of non-invidious reasons for Plaintiff's temporary assignment in Chicago and his subsequent termination. Plaintiff fails to demonstrate that the stated reasons are factually baseless, were not the true reasons for the actions, or were insufficient to motivate the actions at issue. *O'Neal v. City of New Albany*, 293 F.3d 998, 1005 (7th Cir. 2002). Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's retaliation claim is **GRANTED**.

## IV.    Conclusion

For the reasons set forth above, the court **GRANTS** Defendants' Motion for

Summary Judgment (Docket # 41).


**SO ORDERED** this <u>26th</u> day of March 2007.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

David J. Carr
ICE MILLER LLP
carr@icemiller.com

Kristopher N. Kazmierczak
KATZ & KORIN
kkazmierczak@katzkorin.com

Brian S. Kenworthy
KATZ & KORIN
bkenworthy@katzkorin.com

Robert B. Kirsh
KATZ & KORIN
rkirsh@katzkorin.com

Cathleen L. Nevin
KATZ & KORIN
cnevin@katzkorin.com

Margaret Dewey Wielenberg
ICE MILLER LLP
margaret.wielenberg@icemiller.com